Joyce WILSON, individually, executrix, and as natural guardian and next friend of the minor child, Natalie J. Wilson est Datton Wilson, Jr.; Anthony D. Wilson; Anita D. Wilson; Datton Wilson, III; Crystal L. Johnson; Kasha C. Wilson, Plaintiffs–Appellees,

v.

Luther Donald MEEKS; David Scott Lawson; Phyllis Renee Lawson; City of Haysville, a municipal corporation; John Coleman, Defendants,

and

Timothy John STOCK; Bruce K. Powers; Lanon Thompson; Debbie Mann; J. Earl Kitchings, Defendants–Appellants.

Joyce WILSON, individually, executrix, and as natural guardian and next friend of the minor child, Natalie J. Wilson est Datton Wilson, Jr.; Anthony D. Wilson; Anita D. Wilson; Datton Wilson, III; Crystal L. Johnson; Kasha C. Wilson, Plaintiffs–Appellees,

v.

Luther Donald MEEKS, Defendant–
Appellant,

and

Timothy John Stock; Bruce K. Powers; Lanon Thompson; David Scott Lawson; Phyllis Renee Lawson; Debbie Mann; J. Earl Kitchings; City of Haysville, a municipal corporation; and John Coleman, Defendants.

Nos. 94–3179, 94–3180.

United States Court of Appeals,
Tenth Circuit.

April 20, 1995.

Alan L. Rupe (Edward L. Keeley with him on the briefs), Rupe & Gerard Law Offices, P.A., Wichita, KS, for defendants-appellants Stock, Powers, Thompson, Mann, and Kitchings.

Stephen E. Robison (David G. Seely with him on the briefs), Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, KS, for defendant-appellant Meeks.

Jerry Berg, Wichita, KS, for plaintiffs-appellees Joyce Wilson, Estate of Datton Wilson, Jr., and Natalie J. Wilson.

Lonnie R. Knowles, Shackelford, Knowles & Strickland, Houston, TX, on the briefs for plaintiffs-appellees Anthony D. Wilson, Anita D. Wilson, Datton Wilson, III, Crystal L. Johnson, and Kasha C. Wilson.

Before MOORE and EBEL, Circuit Judges, and COOK,* District Judge.

JOHN P. MOORE, Circuit Judge.

Plaintiffs, including the estate of Datton Wilson, Jr., and members of his family, filed a complaint under 42 U.S.C. § 1983 and pendent state law asserting that members of the Haysville Police Department violated Mr. Wilson's constitutional rights by using excessive force, failing to render emergency medical treatment, and participating in a cover-up. Defendants moved for summary judgment based on qualified immunity. The district court granted the motion in part and denied it in part, stating there were disputed facts on the issue of qualified immunity to be resolved at trial. Defendants timely appealed, and we reverse.

I.

This case arises from the shooting death of Mr. Wilson on the night of December 7, 1990. An altercation between Mr. Wilson and David Lawson began as the two men were driving near their home town of Haysville, Kansas. Mr. Lawson was accompanied by his wife Phyllis Renee Lawson and their infant son. Mr. Lawson noticed Mr. Wilson's truck tailgating him. An argument ensued,

and there was a heated verbal exchange in which Mr. Lawson demanded to know if Mr. Wilson was drunk.

Mr. Lawson memorized Mr. Wilson's license plate number, intending to call the police. After disengaging from the fray, Mr. Lawson came upon Haysville Police Officer Timothy Stock, who had stopped his patrol car to write a traffic citation. Mr. Lawson told Officer Stock about the incident, stating Mr. Wilson was "extremely drunk." Officer Stock radioed Officer Luther Donald Meeks, who was nearby in his patrol car. Officer Meeks, upon receiving the call, spotted Mr. Wilson's truck and followed it.

Mr. Wilson parked his truck at his home. As he approached, Officer Meeks saw Mr. Wilson lie down in the truck's front seat. Officer Meeks decided to investigate and passed the property to turn his car around. Mr. Wilson entered his house and retrieved an unloaded .357 magnum revolver. Officer Meeks saw Mr. Lawson's car flashing its lights, so he parked and exited his car. Pursuant to department policy, Officer Meeks was wearing a tape recorder on his belt, which he turned on. The belt tape recorded the entire incident.

When Officer Meeks arrived, Mr. Wilson was standing by his porch and Mr. Lawson was on the property, further away from the house. Mr. Wilson's gun was concealed behind his right leg. Officer Meeks asked what was going on, and Mr. Wilson replied, "You talk to him first." (referring to Mr. Lawson). Mr. Wilson insisted Mr. Lawson get off his property and directed Officer Meeks to remove him. Officer Meeks told Mr. Wilson to "back up" or be arrested for disorderly conduct. Mr. Wilson backed toward the porch.

Officer Meeks suspected Mr. Wilson was holding a weapon, but could not see what was hidden behind Mr. Wilson's leg. Officer Meeks demanded, "I want to see that hand." Mr. Wilson did not comply. Officer Meeks repeated his demand several times and drew his own weapon. Mr. Wilson replied, "No no no" and "Don't do that."

---

* The Honorable H. Dale Cook, Senior Judge for the United States District Court for the Northern District of Oklahoma, sitting by designation.

The parties dispute what happened next. Officer Meeks asserts Mr. Wilson aimed the gun at him. Plaintiffs assert Mr. Wilson held the gun out in a "surrender position."

It is undisputed when Mr. Wilson brought his hand forward with the gun, Officer Meeks shot him twice. The entire incident from the time Officer Meeks arrived on the property to the time he shot Mr. Wilson took approximately 43 seconds.

Mr. Wilson dry fired his gun twice. He fell to the ground face down with his gun underneath him. After Mr. Wilson collapsed, Officer Meeks told him twice to "put the gun down." Officer Meeks continued to hold Mr. Wilson at gunpoint while he radioed for Officer Stock.

Officer Stock arrived moments later. He determined from Officer Meeks that Mr. Wilson's gun was underneath him. He told Officer Meeks to continue covering Mr. Wilson, then disarmed Mr. Wilson by placing his foot on the back of Mr. Wilson's knee, holding him by the shoulder, and locating the gun underneath Mr. Wilson's body. Officer Stock stated he immobilized Mr. Wilson's knee to prevent Mr. Wilson from trying to shoot him. Using the clip-on tie from his own neck to avoid leaving fingerprints, Officer Stock secured Mr. Wilson's gun. Officer Meeks radioed for emergency medical help. Approximately 34 seconds elapsed from the shooting to the radio call.

Off-duty officer Lanon Thompson and Police Lieutenant Bruce Powers arrived on the scene shortly after the shooting, but before the arrival of medical help. Lt. Powers took command at the scene. Lt. Powers ordered Officer Stock to handcuff Mr. Wilson. He then ordered Officer Meeks to block the road with a patrol car to "seal off the block." Then Lt. Powers ordered Officer Meeks to sit in his patrol car.

No officer gave Mr. Wilson medical care or first aid before the arrival of the fire department Emergency Medical Technicians (EMTs). The parties do not dispute that during this time Mr. Wilson was lying face down and breathing. The EMTs arrived first, then the paramedics. Beyond this, the versions of the facts again diverge.

Defendants assert the officers touched Mr. Wilson only to remove his gun and handcuff him. Because Mr. Wilson was breathing, they did not attempt to provide medical treatment or first aid of any kind. They made an affirmative decision to refrain from any such action because they had been trained, to avoid injury, not to move a victim who was breathing.

Plaintiffs allege the officers interfered with fire department EMT Walter Langford's efforts to aid Mr. Wilson. When Mr. Langford arrived at the scene, he found Mr. Wilson lying face down. He knelt beside Mr. Wilson's prone body to check for vital signs. Mr. Langford stated his leg and knees were "saturated in blood" and "wet all over." Mr. Langford had been taught to facilitate a patient's breathing by turning him on his side. Planning to do so, he asked a uniformed police officer at the scene to remove Mr. Wilson's handcuffs.[1] The officer refused, saying he did not want to get blood on his hands. Mr. Langford had gloves, and the officer did not. Mr. Langford offered to get the officer some gloves, but the officer told Mr. Langford to remove the handcuffs himself. It took one to two minutes to locate the key to the handcuffs and remove them. The EMTs proceeded to perform CPR, spelled by Lt. Powers.

Plaintiffs assert Mr. Wilson had difficulty breathing because he was face down. Plaintiffs' medical experts Dr. Kenneth Ransom and Dr. William Eckert stated the cause of Mr. Wilson's death was not the gunshot wounds but asphyxiation—either due to "positional asphyxiation" or inspiration of blood, dirt, and vomit. Dr. Ransom's finding was based on the time of death—too soon for death from blood loss—and the amount of blood lost—too little to be fatal. Plaintiffs also assert the tape on Officer Meeks' belt contains sounds of high-pitched, labored

---

**1.** Mr. Langford identified the officer by description only. However, Officer Thompson stated the only uniformed officer present at that moment was Lt. Powers. We reach the same conclusion by elimination: Officer Stock was in the Wilson home, Officer Meeks was in his patrol car, and Officer Thompson was not in uniform.

breathing, indicating airway blockage. They offer a photograph showing Mr. Wilson's eyeglasses, allegedly covered with dirt and vomit. Mr. Langford stated he could not check Mr. Wilson's eyes for pupil dilation because they were covered with dirt. He also stated he vacuumed a cup of pink, frothy liquid out of Mr. Wilson's mouth and throat. Dr. Eckert stated if Mr. Wilson had been turned over to facilitate his breathing, he might have survived.

After paramedics arrived, Mr. Wilson was in an unresponsive state. He was taken to the hospital and pronounced dead shortly thereafter.

The facts underlying plaintiffs' cover-up claims primarily concern Debbie Mann, Communications Supervisor at Haysville Police Department, and James Earl Kitchings, Chief of Police of Haysville. The cover-up claims arise from four allegations: the loss of photographs, the loss of a witness report, the "code of silence," and the alteration of the belt tape.

The lost photographs consisted of two rolls of exposed film taken of Mr. Wilson's body by Haysville police after the body was removed from the scene. Both rolls of film were sent to a developer but allegedly produced no pictures and were discarded. Plaintiffs allege Ms. Mann had sole control of the film. The photos allegedly would have shown dirt and vomit on Mr. Wilson's face.

William Sample, a neighbor of the Wilsons, made a handwritten statement of the events of December 7. Plaintiffs allege Ms. Mann had responsibility for keeping the report. On the night of the shooting, a police officer asked Mr. Sample to write a statement. Mr. Sample did so, and later delivered his statement to the police department in person. A copy of the report appears in the record. Mr. Sample did not see the shooting. He heard the shots, then went outside and saw Mr. Wilson lying on the ground. His report described the position of Officer Meeks' and Officer Stock's cars and the fact that the officers told Ms. Lawson to go home after the shooting.

On December 9, Mr. Kitchings called a departmental meeting, played Meeks' belt tape and ordered everyone not to discuss the Wilson case either inside or outside the department. Plaintiffs allege this meeting and the statements made by Mr. Kitchings caused the officers to file their reports late and not to review their reports for accuracy and completeness. Plaintiffs further allege there was no internal investigation by the Haysville Police, the Kansas Bureau of Investigation, or the District Attorney.

Finally, plaintiffs' audio expert William Andrews stated the belt tape was altered. There was a 4.5 second section erased at the front of the tape. This section had been intact when the tape was played before the grand jury. Also, the tape was altered to include the sound of the handgun cocking. Mr. Andrews based this conclusion on an audio frequency pattern on the tape that could not have been produced by the type of tape recorder on Officer Meeks' belt.

## II.

Qualified immunity is a "purely legal question" we review de novo. *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). Denial of summary judgment is not ordinarily a final appealable order. *See Walter v. Morton,* 33 F.3d 1240, 1242 (10th Cir.1994). However, denial of a defendant's motion for summary judgment on the affirmative defense of qualified immunity is eligible for immediate interlocutory appeal. *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). Because of the review posture of this case, the question here is simply "whether, on the basis of the pretrial record, there exists a conflict sufficiently material to defendants' claim of immunity to require them to stand trial." *DeVargas v. Mason & Hanger–Silas Mason Co.,* 844 F.2d 714, 719 (10th Cir.1988).

Summary judgment should be granted where, taking the facts in the light most favorable to the non-moving party, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Deepwater Investments, Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110–11 (10th Cir.1991); *Russillo v. Scarborough,* 935 F.2d 1167, 1170 (10th Cir.1991).

Upon a motion for summary judgment, the moving party bears the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to produce evidence creating a genuine issue of material fact to be resolved at trial. *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1539 (10th Cir.1993). To avoid summary judgment, the non-moving party must present more than "a mere scintilla of evidence." *Id.* There must be enough evidence to allow a reasonable jury to find for the non-moving party. *Id.* The non-movant "may not rest upon mere allegations or denials" of the pleadings, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)), but must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990).

Plaintiffs brought this action under section 1983, which provides civil redress for deprivation of constitutional rights. 42 U.S.C. § 1983. Section 1983 was enacted "to provide protection to those persons wronged by the misuse of power." *Owen v. City of Independence, Mo.,* 445 U.S. 622, 650, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673 (1980) (citations omitted). Section 1983 creates no substantive civil rights, only a procedural mechanism for enforcing them. *Gallegos v. City & County of Denver,* 984 F.2d 358, 362 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2962, 125 L.Ed.2d 662 (1993).

■ Qualified immunity is an affirmative defense against section 1983 claims. *Quezada v. County of Bernalillo,* 944 F.2d 710, 718 (10th Cir.1991). Its purpose is to shield public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald,* 457 U.S. 800, 806, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). The defense provides immunity from suit, not merely from liability. *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815. Its purpose is to spare defendants the burden of going forward with trial.

*See Powell v. Mikulecky,* 891 F.2d 1454, 1457 (10th Cir.1989). However, qualified immunity is not a defense when officials' actions violate clearly established constitutional rights. *Quezada,* 944 F.2d at 718. The question of qualified immunity therefore dovetails almost precisely with the substantive inquiry in a section 1983 action; both depend on the specific contours of the constitutional right at issue. *See id.* (stating the inquiries are identical in excessive force actions).

■ Once the affirmative defense of qualified immunity is asserted, the plaintiff bears the burden of coming forward with facts "sufficient to show both that the defendant's alleged conduct violated the law and that that law was clearly established when the alleged violation occurred." *Pueblo Neighborhood Health Ctrs., Inc. v. Losavio,* 847 F.2d 642, 646 (10th Cir.1988). To survive a motion for summary judgment, the plaintiff must show the right was "clearly established" in a "particularized" sense. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). One purpose of this requirement is notice; officials cannot "reasonably be expected to anticipate subsequent legal developments" nor "fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Powell,* 891 F.2d at 1456 (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738). This court has held that for a right to be "particularized," there must ordinarily be a Supreme Court or Tenth Circuit decision on point, or "clearly established weight of authority" from other courts. *Medina v. City & County of Denver,* 960 F.2d 1493, 1498 (10th Cir.1992).

### III.

■ Defendant Meeks challenges the district court's denial of summary judgment for the excessive force claim. In *Graham v. Connor,* the Supreme Court held that all excessive force claims should be analyzed under the reasonableness standard of the Fourth Amendment. 490 U.S. 386, 394, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989). This court has held the reasonableness standard is "clearly established" for the purposes of section 1983 actions. *Dixon v. Richer,* 922

F.2d 1456, 1462 (10th Cir.1991). The reasonableness inquiry is an objective one and heavily fact dependent. *Id.* The factors employed to determine reasonableness are the severity of the crime at issue, whether the subject poses an immediate threat to the safety of the officer, and whether the subject is resisting arrest. *Graham,* 490 U.S. at 396, 109 S.Ct. at 1871.

Plaintiffs argue the district court properly held there were disputed material facts on the reasonableness of Officer Meeks' actions. The alleged dispute mostly pertains to the second factor of *Graham,* focusing upon whether Mr. Wilson aimed his gun at Officer Meeks.

In support of his defense, Officer Meeks offers specific evidence. First, he stated he heard the sound of a handgun cocking. Officer Meeks stated Mr. Wilson pointed the gun at him. Two bullets hit Mr. Wilson, one entering his chest straight on, and one hitting the fingers on the trigger of the gun, severing them, and then hitting Mr. Wilson's chest. Rene Lawson stated she saw Mr. Wilson point the gun at Officer Meeks. When she heard the shot, she mistakenly believed Mr. Wilson had shot Officer Meeks.

Plaintiffs' assertion that Mr. Wilson held the gun in "surrender position" is unsupported by the record. It avowedly rests on expert forensic evidence of the position of Mr. Wilson's hand and gun at the moment of impact. The phrase itself was apparently coined by plaintiffs, not by any expert. Plaintiffs provide two alternative, but not necessarily inconsistent, descriptions of the "surrender position." The first is that Mr. Wilson was holding the gun pointing downward instead of horizontally at Officer Meeks. The second is that the gun was "rolled on its side."

In support of the first description, plaintiffs cite to the statements of Officer Meeks and a report by expert Wayne Dunning. We fail to see anything in Officer Meeks' statements that supports this description. Dr. Dunning's report includes photos of a model reconstructing the most likely "gun/hand relationship" at the time Mr. Wilson was shot. Each picture shows the model holding the gun in the right hand, straight out in front of the chest. One picture shows the gun in a loose, slightly downward position. Others show it pointing horizontally. None of the positions described or reconstructed in the record is a "surrender position." We note Mr. Wilson's finger was on the trigger at the moment of impact. Indeed, he "dry fired" his gun twice after being shot.

In support of the second description, plaintiffs cite to expert forensic evidence as to the path of the bullet that hit Mr. Wilson's right hand. Plaintiffs assert this bullet ricocheted sideways off Mr. Wilson's hand. They conclude the arm was therefore not pointed straight at Officer Meeks but pointed to the right side. Mr. Wilson's severed fingers were found some distance to the right side of his body. Plaintiffs' experts stated the blood spatters to the right of the body supported the same conclusion: the blood spatters were round rather than elliptical, indicating blood that dropped straight down, perpendicular to the plane of the ground. Again, none of the positions described by this evidence is a "surrender position."

Mr. Wilson's hand, by all accounts, was not pointed far enough to the right to dispute Officer Meeks' contention he reasonably feared for his life. Indeed, it is hard to imagine that pointing a .357 magnum in any direction would not cause a reasonable police officer to fear for someone's life—if not his own, then the life of a bystander or the gunman himself.

Plaintiffs have erroneously cast this factual dispute as an inquiry into whether Mr. Wilson was surrendering. They point out that he had backed up as Officer Meeks directed, and that he was "quivering" and not holding his gun horizontal and perpendicular to the ground. Perhaps Mr. Wilson intended to surrender. If so, his death is particularly tragic. However, the inquiry here is not into Mr. Wilson's state of mind or intentions, but whether, from an objective viewpoint and taking all factors into consideration, Officer Meeks reasonably feared for his life. Qualified immunity does not require that the police officer know what is in the heart or mind of his assailant. It requires that he react

reasonably to a threat. Officer Meeks did so.

Plaintiffs further contended at oral argument that Mr. Wilson could not have followed Officer Meeks' directions to "let me see that hand" in any other way than the way he did—by revealing his hand holding the gun. Common sense tells us otherwise. Mr. Wilson could have dropped his weapon or told Officer Meeks he wished to surrender it. Plaintiffs themselves describe Mr. Wilson as "a certified small arms expert, educated in law enforcement and the head of a security force." It follows, then, Mr. Wilson would have understood how to surrender a weapon.

Plaintiffs make three additional doctrinal arguments about excessive force. First, they argue a policeman must verbally warn a suspect before using lethal force. They cite the Haysville Police Department regulations requiring a verbal warning before the use of deadly force. However, violation of a police department regulation is insufficient for liability under section 1983. *Davis v. Scherer*, 468 U.S. 183, 194, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984). Moreover, the regulation requires a verbal warning only where "feasible."

Second, plaintiffs argue Mr. Wilson had a right to defend himself against "a rude, insolent overbearing cop" like Officer Meeks. Plaintiffs cite no authority for this proposition. It is without merit.

Finally, plaintiffs argue the shooting by Officer Meeks was unreasonable because by commanding Mr. Wilson to show his hand, Officer Meeks caused the final confrontation. This is tantamount to the proposition that a citizen has a Fourth Amendment right to be free of police actions contributing to the use of deadly force by that citizen. Plaintiffs cite *Quezada*, 944 F.2d at 717. *Quezada* remanded a section 1983 action to the district court in light of the then-newly enunciated objective reasonableness standard in *Graham*, directing the district court to analyze facts such as "Deputy Sauser's actions—including his raising and lowering of his gun and his failure to take cover." *Id.* However, the "failure to take cover" was presumably at issue only insofar as it bore upon whether the officer's life was truly in danger. The court never stated that it bore upon whether the officer contributed to the subject's use of deadly force. *Quezada* does not clearly articulate the right plaintiffs seek to establish.

Other circuits have held precisely contrary to plaintiffs' proposition, confining the inquiry on excessive force to whether the officer was in danger at the moment of the threat. *Fraire v. City of Arlington*, 957 F.2d 1268, 1276 (5th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 462, 121 L.Ed.2d 371 (1992) ("[R]egardless of what had transpired up until the shooting itself, [the suspect's] movements gave the officer reason to believe, at that moment, that there was a threat of physical harm.") (citing *Young v. City of Killeen, Tex.*, 775 F.2d 1349, 1353 (5th Cir.1985) (Finding no liability where the "only fault found against [the officer] was his negligence in creating a situation where the danger of such a mistake would exist.")); *Drewitt v. Pratt*, 999 F.2d 774, 780 (4th Cir.1993) (issue was "whether at the moment of the shooting Officer Pratt had probable cause to believe that Drewitt posed a threat of death or serious bodily harm to him."). *Zuchel v. City & County of Denver*, 997 F.2d 730, 738 (10th Cir.1993), suggests that police should be instructed on how to avoid deadly force situations, but only within the context of the city's derivative liability in training officers. This is a different inquiry.

Plaintiffs have failed to produce evidence to unequivocally rebut Officer Meeks' assertion that Mr. Wilson aimed the gun at him. This incident transpired in less than a minute. Any police officer in Officer Meeks' position would reasonably assume his life to be in danger when confronted with a man whose finger was on the trigger of a .357 magnum revolver pointed in his general direction. The exact manner in which Mr. Wilson held out the gun is not dispositive. The district court erroneously failed to grant summary judgment based on qualified immunity.

## IV.

Defendants Meeks, Powers, Stock, and Thompson argue the district court erred in denying summary judgment on the claim of

failure to render medical aid. Defendants assert as a matter of law their duty was discharged when they summoned medical help.

There are two lines of authority on this issue. The first, based largely on Due Process jurisprudence, defines when police officers who injure civilians are required to provide medical aid. The second, based on Eighth Amendment jurisprudence, defines when prison officials are required to provide medical aid to those in custody.

The first line of analysis begins with *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983), a case in which the Supreme Court held a city had a duty to provide medical treatment for a person injured by police. There, an officer shot a suspect fleeing the scene of a burglary. *Id.* at 240, 103 S.Ct. at 2981. The court held, based on the Due Process Clause, the city "fulfilled its constitutional obligation by seeing that [the injured suspect] was taken promptly to a hospital that provided the treatment necessary for his injury." *Id.* at 245, 103 S.Ct. at 2983.

This court has not spoken on the issue of a duty to provide, as well as summon, medical care under the Fourteenth Amendment. Plaintiffs cite *Rock v. McCoy*, 763 F.2d 394, 396 (10th Cir.1985), and *Meade v. Grubbs*, 841 F.2d 1512, 1519 (10th Cir.1988). However, these cases are distinguishable because in each case no medical help was ever summoned.

The primary case employing the Eighth Amendment standard of care is *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). It held "deliberate indifference" to the medical needs of prisoners a violation of the Eighth Amendment ban on cruel and unusual punishment. *Id.* at 104, 97 S.Ct. at 291. The duty to provide access to medical care extends to pretrial detainees as well. *Massachusetts Gen. Hosp.*, 463 U.S. at 244, 103 S.Ct. at 2983.

The two lines of analysis come together in *Howard v. Dickerson*, 34 F.3d 978 (10th Cir. 1994). *Howard* applied the Eighth Amendment standard of deliberate indifference to the Due Process rights of pretrial detainees.

Eighth Amendment jurisprudence is not always applied to pretrial detainees. *Littlefield v. Deland*, 641 F.2d 729 (10th Cir.1981). *Howard* relaxed the line of demarcation, applying the deliberate indifference standard of *Estelle* to a pretrial detainee via the Due Process protections of the Fourteenth Amendment. *Howard*, 34 F.3d at 980–81. *Howard* also held the legal standard of deliberate indifference was clearly established for the purposes of section 1983. *Id.* at 981; *see also Garcia v. Salt Lake County*, 768 F.2d 303, 307 (10th Cir.1985) (Fourteenth Amendment claim for man who died in custody based on failure to provide adequate medical observation); *Martin v. County Comm'rs of County of Pueblo*, 909 F.2d 402 (10th Cir. 1990) (Fourteenth Amendment claim for arrest of plaintiff in her hospital room).

■■■■ On the duty to render medical aid, the district court in the instant case cited *Maddox v. City of Los Angeles*, 792 F.2d 1408 (9th Cir.1986). There, the Ninth Circuit stated, "We have found no authority suggesting that the due process clause establishes an affirmative duty on the part of police officers to render CPR in any and all circumstances." *Id.* at 1415. The district court seized upon this language, holding that *Maddox* did not preclude police officers' duty to provide medical treatment in all situations. The district court reasoned that just because the officers had no duty to render aid in "any and all" situations did not mean there were not some circumstances in which they had such a duty. We believe *Maddox* supports the opposite position, holding there is no duty to give, as well as summon, medical assistance, even if the police officers are trained in CPR. *Id.* at 1411, 1415. The district court here cited no other authority for the duty to render medical aid, or for guidance on what circumstances would mandate action. One ambiguous bit of dictum in a Ninth Circuit opinion cannot form the basis for a "clearly established" and "particularized" duty.

Nevertheless, we note there is a difference between medical aid and first aid. Few citizens would be likely to want police officers to render medical aid. Such steps are best left to the qualified and highly trained personnel

who act as paramedics or EMTs. This is well illustrated by the record on appeal. Plaintiffs repeatedly insist any patient with an airway blockage should be "rolled over." Dr. Eckert stated a person should be "on his back" to facilitate breathing. However, Mr. Langford stated that to clear an airway and avoid injury, a patient should be turned on his side. To pinion the police in the center of such a medical dispute is unfair and unwise.

■ However, anyone can render first aid. The goal of first aid is to sustain life until those who render medical aid arrive. As plaintiffs suggest, first aid attends to the patient's "ABC"—airway, breathing, and circulation. First aid is a limited form of intervention with the immediate goal of preventing death. We do not hold here that police officers never have a duty to give first aid. However, we see no such duty on these facts.

We further note this is a case of both malfeasance and nonfeasance. Taking the facts as most favorable to plaintiffs, defendants took deliberate actions that may have aggravated Mr. Wilson's medical needs. Insofar as the police committed malfeasance in this case, the outcome is controlled by *Howard*. In *Howard*, a police officer arrested a woman in her home following a hit and run accident. 34 F.3d at 979. The officer handcuffed her despite her statements that she recently underwent neck surgery and handcuffing her hands behind her back would be painful. Ms. Howard was wearing a neck brace when she was arrested. We held Ms. Howard had stated a cause of action under section 1983. *Id.* at 981.

First, plaintiffs allege the act of handcuffing Mr. Wilson prevented him from helping himself to breathe. However, in the instant case, unlike in *Howard*, the police officers could not be expected to know their actions would exacerbate a medical problem. Also, in the instant case, the detainee was armed and could have posed a threat to human life. As defendants correctly note, the first duty of a police officer is to ensure the safety of the officers and the public. Handcuffing is a necessary expedient to this end. Handcuff-

ing an armed assailant, even after he has been shot, is not a constitutional violation.[2]

Second, plaintiffs allege the police interfered with attempts to help Mr. Wilson. There is only one piece of evidence offered in support of this allegation—the obstruction of Mr. Langford's efforts. The unidentified officer's refusal to bloody his hands, while perhaps not evincing the proper moral concern for human life, is not a constitutional violation. Mr. Langford wore gloves, and it was acceptable for the officer to ask him to remove the handcuffs. Mr. Langford, though asked pointedly whether the one to two minutes necessary to unlock the handcuffs prevented him from performing CPR, responded that he was still checking Mr. Wilson's vital signs when the handcuffs were removed.

Defendants further argue that an Eighth Amendment violation for deliberate indifference to medical needs requires a level of subjective intent amounting to criminal recklessness. We need not reach this issue.

The Constitution does not empower us to command police officers to show compassion for those they injure in the line of duty. Neither does it empower us to second-guess the police where their actions are reasonable and within constitutional boundaries. To do either would undermine the policies of the qualified immunity doctrine. Therefore, despite the moral considerations we recognize in this case, we must conclude its circumstances do not support plaintiffs' constitutional claims.

### V.

■ Defendants Stock, Powers, Thompson, Kitchings, and Mann argue that the district court erred in failing to grant their motion for summary judgment on the allegations of a so-called cover-up. Plaintiffs cast this cause of action as a deprivation of the right to access to courts. The district court held there were issues of fact to be resolved at trial, citing the dispute over whether the belt tape recording was altered. Defendants asserted the defense of qualified immunity,

2. We note the handcuffing of Mr. Wilson could raise a question of excessive force. Handcuffing is a forceful seizure. However, we note, too, that the claims of excessive force were framed against Officer Meeks alone.

and the district court concluded, "If the officers kept plaintiffs from having a meaningful access to the courts through a conspiracy and code of silence, then their actions were not reasonable."

This cursory analysis, however, ignores the rule that plaintiffs must set forth a clearly established duty to support their claim. This circuit has never created such a duty. Other circuits have recognized a cause of action for cover-up. *Williams v. City of Boston,* 784 F.2d 430, 435 (1st Cir.1986) (in dicta); *Bell v. City of Milwaukee,* 746 F.2d 1205 (7th Cir. 1984); and *Ryland v. Shapiro,* 708 F.2d 967 (5th Cir.1983). Yet the distinction is drawn between interference with discovery and interference with the filing of the complaint. The Fifth Circuit limits the right of access claim to the latter. *Foster v. City of Lake Jackson,* 28 F.3d 425, 430 (5th Cir.1994). Given *Ryland* was the first case establishing the right under section 1983, this limitation is persuasive. *Bell* relied on *Ryland,* and the Fifth Circuit later rejected that reliance. *Id.* at 430 n. 7 ("We question *Bell's* reliance on *Ryland* for any broader definition of right of access than one encompassing the right to institute suit."). We conclude these cases do not comprise the "great weight of authority" necessary for a clearly established duty based on the alleged cover-up in the instant case.

Even assuming such a duty exists, defendants are still entitled to qualified immunity on these facts. Plaintiffs allege Mr. Kitchings ordered a "code of silence" concerning the Wilson shooting. This phrase was apparently introduced by plaintiffs' expert Edmond B. Lester. Insofar as the "code of silence" refers to Mr. Kitchings' directive to police officers not to discuss the case, it is not a constitutional violation. There is no constitutional duty for a police department to disclose details concerning a police shooting to the public. *Williams,* 784 F.2d at 435. Naturally, the duty to disclose such facts may arise in response to discovery or other legal process. In such a case, however, the duty is merely legal rather than constitutional.

There is no allegation that Mr. Kitchings committed perjury, tampered with or destroyed evidence, or directed any other person to do so.

Similarly, there is no constitutional duty for police officers to review their reports for accuracy or completeness. Of course, to do so would well serve the police and public. Indeed, doing so might help ensure the presentation of accurate and consistent evidence in support of motions for summary judgment such as this one. Given these facts, we would be more likely to conclude the failure to review reports is evidence there was no cover-up, because the first effort of conspirators is getting their stories straight.

Moreover, plaintiffs' assertion that Mr. Kitchings' meeting was "perceived as a directive not to review reports" is another turn of phrase not borne out by the record. There is no allegation that Mr. Kitchings directed anyone not to review his own reports. That anyone interpreted his statements in such a way is mere speculation. The record indicates there was a directive to send all reports on the Wilson shooting to a single officer—Captain Michael McElroy. The purpose of this directive was apparently to centralize the evidence of the shooting, for which a civil suit was already being contemplated. For this reason, the officers' reports were not reviewed, as usual, by their supervisors. Designating a single administrator to collect evidence in a major, visible case such as this is appropriate. In fact, the grand jury that investigated the shooting admonished the Kansas Bureau of Investigation for not doing so itself.[3]

Plaintiffs also allege there was no investigation by the Haysville Police, by the District Attorney, and by the Kansas Bureau of Investigation. Plaintiffs offer no evidence of this assertion; indeed, the record contains KBI autopsy photographs and the written findings of the grand jury. Moreover, plaintiffs identify no constitutional right to demand that such an investigation be conducted.

---

**3.** We note that one of the supervisors divested of his reviewing function was Lt. Powers. This seems wholly appropriate, given Lt. Powers is a defendant in this case and was a participant in the incident.

██ Plaintiffs' additional factual predicate for this claim is extremely incoherent. Plaintiffs allege various conflicting evidence—the exact time of the arrival of Mr. Wilson's car at his home, the exact time of the arrival of firemen at the scene, and the direction of Officer Meeks' parked car, to name a few. The best we can make of this claim is that conflicting evidence given by the different officers and witnesses indicates a cover-up. We believe conflicting evidence more likely indicates the opposite. Moreover, the facts involved are irrelevant. Even if defendants concealed such facts, to do so would not deprive plaintiffs of their right of access to courts.

The alleged loss of Mr. Sample's statement is also not a constitutional violation. A copy of that statement and the transcript of Mr. Sample's deposition appears in the record. Thus, the loss of the statement resulted in no harm to plaintiffs; their access to courts was in no way curtailed by its "loss."

██ The loss of the photographs is a more serious allegation. The record indicates that the photos taken by police did not come out, but plaintiffs do not allege they were purposefully destroyed. It may be that the Haysville Police were careless in their photography, but such behavior does not rise above negligence. It is well settled that merely negligent acts or omissions will not support a cause of action under section 1983. *See Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1985). Moreover, we note the record is replete with autopsy photographs, KBI autopsy photographs, and over two dozen Sheriff's photos of the scene and the Wilson home. Also, in response to plaintiffs' discovery request, defendants agreed to produce the photographs taken by Officer Richard Lytle at the hospital the evening of the shooting.

Plaintiffs further allege the belt tape was altered to include the cocking sound, and the first 4.5 seconds of the tape have been erased. Neither of these allegations, if taken as true, support a claim of deprivation of access to the courts as we understand that concept. Plaintiffs fail to describe the content of the first 4.5 seconds or how that content is relevant to the case, despite that section being intact at the grand jury investigation. Erasure of that section could be consistent with mere negligence or intentional misfeasance, yet plaintiffs fail to allege either. Most important, plaintiffs fail to make any cogent argument how either alteration deprives them of access to the court or bears upon their claims of excessive force or failure to render medical aid. Indeed, the tape is not substantive evidence on these issues because whether the gun was cocked is not dispositive. Even if the gun was not cocked, or if Officer Meeks merely did not know whether the gun was cocked, the remaining evidence nevertheless supports the proposition he reasonably feared for his life. Moreover, the cocking of the gun has absolutely no relevance to the issue of giving medical aid.

We conclude the facts here do not violate a clearly established duty under the constitution. The district court erred in refusing to grant summary judgment based on qualified immunity.

### VI.

For the reasons set forth above, we hold the district court erred in denying summary judgment to defendants based on qualified immunity. There are no issues of material fact here. In their briefs on appeal, in their memoranda in opposition to summary judgment, and at oral argument, plaintiffs have repeatedly made assertions not borne out by the record. Asserting a "position of surrender" or "code of silence" does not create evidence where there is none. Numerous but unsupporting citations to the record notwithstanding, such creative phraseology borders on misrepresentation. Long, rambling, incoherent statements of immaterial facts similarly only serve to obfuscate the issues and delay the process of justice. As this reversal indicates, such tactics are not only improper but ultimately ineffective.

Plaintiffs have filed a number of motions on appeal, including a motion to award sanctions against defendants for filing a frivolous appeal. We have reversed the district court,

so we consider this appeal meritorious, not frivolous. The motion for sanctions is therefore denied. Of the remaining motions, some were disposed of prior to oral argument. The remainder are now moot.

**REVERSED.**