James R. BOND, D.C., Plaintiff,

v.

Jimmy QUEEN, Jason Lowrey, Mark Staats and Tom Chancellor, Defendants.

No. 98–4134–JTM.

United States District Court, D. Kansas.

Sept. 23, 1999.

William L. Fry, William Fry & Associates, Wichita, KS, for Plaintiff.

Edward L. Keeley, William Tinker, Jr., McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, KS, for Defendants.

### MEMORANDUM ORDER

MARTEN, District Judge.

This is an action under 42 U.S.C. § 1983 against four Derby, Kansas police officers. The plaintiff, James R. Bond, raises claims against the defendants for, among other things, false arrest and excessive force. The defendants have moved for summary judgment. For the reasons stated herein, the defendants' motion is hereby granted.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is ·entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital,* 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Findings of Fact

Before discussing the factual findings required by the evidence before the court, the court must address two points. First, the plaintiff has introduced videotapes taken from the two police cars, and repeatedly invoked the videotapes as proving one asserted fact after another. However, an actual viewing of the videotapes demonstrates that, far from assisting in understanding the events underlying the action, the tapes are almost completely without value. The tapes are taken from forward-looking cameras mounted in the defendants' police vehicles parked along a city street in Derby. The incident occurred at night. In the first tape, taken from the Queen/Staats vehicle, the camera is facing another car, parked on the same side of

the street but pointed in the direction of the camera with its headlights on. The second tape is taken from the Lowery/Chancellor vehicle, which is parked closely behind another police vehicle. In both tapes, the actions of the parties to the litigation occur in the darkness beyond the range of the cameras.

The audio quality of the tapes is less than poor. This may be due to the fact that much of the action between the parties occurred at some distance from the vehicles. For most of the relevant portions of the tapes, no sound at all can be detected. Even where voices can be heard, they are frequently unintelligible. All plaintiff has presented are the tapes themselves; he has made no attempt to transcribe them or to identify the voices on the tapes. With few exceptions, the tapes are simply not probative of the key facts in the case—whether the officers have probable cause for an arrest of Bond, whether he resisted arrest, and whether the level of force actually used was excessive.

■ The second preliminary point is the failure of the plaintiff's response to adhere to the rules regarding summary judgment briefing. Thus, the response frequently responds to facts presented as uncontroverted by the defendants without directly citing evidentiary materials, as required by the local rules. Instead, the response frequently responds by simply stating that the asserted fact is "deceiving" and "fails to set forth important material facts as indicated by the videos ... and the Additional Facts set out below." (E.g., Plf. Resp. Fact ¶ 10, at 3). D.Kan.R. 56.1 explicitly requires a response to a summary judgment motion to "refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, shall state the number of movant's fact that is disputed." The purpose of the rule is to require litigants, if they contest an asserted fact, to present their evidence on the issue directly. The plaintiff's response frustrates this purpose by creating a separate factual narrative, frequently without any specific reference at all to the statement of facts presented by the defendants. To the extent the response does not comply with the requirements of D.Kan.R. 56.1, the fact presented by defendants is deemed admitted.

At approximately 10:50 p.m. on August 10, 1997, sixteen-year-old Celeste Morris called 911 from her home at 236 Teal Drive in Derby, Kansas. Her call was transferred by 911 to the Derby Police Department. Celeste told the police dispatcher that her mom's boyfriend was "throwing things" at Celeste, "physically hurting" her. She said he threw a purse and hit her in the back "real hard" and had shoved her up the stairs. She also related that he was screaming at her mom, and the dispatcher could hear yelling in the background. Celeste was crying during at least part of this conversation with the dispatcher. Celeste identified James Bond, the plaintiff in the present action, as the man doing these things. Near the end of this conversation, Celeste told the dispatcher that Bond had left the house.

The police dispatcher sent two officers, Sergeant Mark Staats and Officer Jimmy Queen, to respond to "a disturbance at 236 Teal Drive." Staats and Queen were advised by radio that "apparently the male subject of this residence is 46 and has been throwing objects at the mother and daughter." The code "46" meant the subject was possibly intoxicated. They were also advised that the "suspect's name" was James Bond and that he may have left the residence. (Radio Transcr.Def.Exh. 1).

Staats and Queen arrived at the residence within a few minutes, and saw Bond backing a vehicle out of the driveway and starting to head westbound on Teal. Officer Queen moved in front of Bond's vehicle, which then stopped. Bond told Queen that his daughters had run off, and he wanted to find them. Queen told Bond that he had to stay there until the officers could find out what was going on. According to Queen, Bond was irate and yelling at the beginning of this conversation, but then he calmed down. Bond stayed at his

vehicle with Staats while Queen went to the house to investigate.

Staats asked Bond to get out of the car, and Bond did so. A young girl approached, and Bond asked her where her sister was. Bond told Staats that he wanted to go find his daughter, but Staats told him that Staats needed to get some information from him first. Bond became agitated by this.

Staats did not know Bond, and did not know of his role in the reported disturbance. Staats needed information from Bond because the officer was investigating a disturbance call. Staats has stated that at that time he thought "something bad had happened in that house, bad enough that a young child had fled the house late at night." (Staats dep. Exh. 3 at 29–31). He did not know what Officer Queen was going to find in the residence.

Staats asked Bond for his name. Bond responded that he did not know if he would tell him or not. Bond was very intent on leaving the scene. He said he wanted to find his daughter, but Staats did not know what her involvement in the disturbance was. He did not know if Bond, who appeared very agitated, was trying to find her to harm her.

Bond then turned around to walk back toward the driver's door of his vehicle, saying that he was going to go get his daughter.

Staats told Bond that he was under arrest for obstructing Staats's official duty. Staats was investigating a potential crime involving domestic violence, and believed that Bond was trying to leave the scene in a vehicle which would obstruct Staats from proceeding with his investigation. When Staats turned Bond around to try to handcuff him, Bond finally identified himself as James Bond. Staats tried to grab both of Bond's arms to place them behind Bond's back for cuffing, but Bond physically resisted the handcuffing.

Officer Queen was at the door of the residence when he heard loud yelling from the street. Seeing Staats trying to handcuff Bond and Bond's resistance, Queen hurried back to the struggle. They were in the street but near the curb and grassy area of the front yard. Queen grabbed one of Bond's arms and Staats grabbed the other. Queen told Staats to take Bond down to the grass in front of them, and prepared to take Bond across his hip down to the grass. However, all three men lost their balance and fell backwards into the street.

It is uncontroverted that, in the fall, Staats struck his head on the asphalt street and was rendered unconscious. Staats suffered a concussion and an injury to his right shoulder which necessitated the summoning of EMS and hospitalization.

After the fall, Queen radioed for backup officers to come to the scene. Before they arrived, Queen rolled Bond onto his stomach and completed handcuffing him.

Police Officers Tom Chancellor and Jason Lowery arrived at the scene soon after the call for backup. Queen told them to put Bond in a patrol car. Chancellor and Lowery escorted Bond to Lowery's patrol car. According to Chancellor, Bond physically resisted and attempted to pull free.

Bond's response denies that he resisted arrest—although this denial, as the court discusses below, is made in only the most general of terms and is unsupported in the evidence. Bond makes no attempt to controvert that he began screaming obscenities at the officers.

The rear passenger door of the patrol car was opened, and the officers instructed Bond to get in. Bond refused and physically resisted by pushing himself away from the patrol car. Although the officers repeatedly told Bond to get in the car, Bond continued to push away and resist. Chancellor then delivered a distraction strike with his knee to Bond's peroneal nerve on his left thigh. This was done pursuant to Chancellor's training as a police officer on pressure point control tactics. Following the procedure, the officers were able to place Bond in the car.

Bond was taken to the police station at approximately 11:09 p.m. by Officer Lowery, and Officer Chancellor followed them there. At the station, Bond was asked if he wanted EMS to look at his shoulder and wrist, about which he was complaining. Bond told the officers it was not an emergency and declined EMS services. To alleviate Bond's complaint of wrist pain, Officer Chancellor removed the handcuffs from behind Bond's back and secured only his left wrist to a bench with the cuffs.[1]

After EMS left the scene with Staats, Officer Queen went into the residence at 236 West Teal at approximately 11:19 p.m. to investigate the domestic violence call by Celeste Morris. Queen interviewed and obtained written statements from Celeste, her mother Rebecca Morris, and Bond's daughter, Rachel Bond. It is uncontroverted that both Celeste and Rachel said Bond had pushed Celeste into the garage door upstairs and hit her in the back with a purse. Rebecca was not in a position to see what happened upstairs but confirmed the other events described by Celeste and Rachel. Celeste said that the purse was very hard and did hurt her, although it did not cause physical injury.

After completing his investigation at the residence, Queen returned to the police station and interviewed Bond, who waived his Miranda rights. Bond denied throwing anything at Celeste, but it is uncontroverted that Bond apologized for losing his temper and for Sergeant Staats .getting hurt. Queen told Bond he was being arrested for battery on a law enforcement officer, obstruction of official duties, disorderly conduct, and battery on Celeste.

Pursuant to K.S.A. 22–2307, the Derby Police Department has a domestic violence policy which requires police officers to arrest a suspect when probable cause exists to believe the suspect committed such an offense, even if the victim is unwilling to prosecute.

Queen then transported Bond to jail at the Sedgwick County Adult Detention Center at approximately 1:39 a.m. on August 11, 1997. It is uncontroverted that, during that transport, Bond again apologized for losing his temper and wanted Queen to tell Staats that Bond was sorry Staats got hurt. At the jail, Bond was asked in a Booking Medical Assessment form whether he had any medical problems the jail should know about, and Bond indicated none.

Bond complained of pain at 2:30 a.m. and was given pain medication by jail clinic staff. Bruises and swelling on his thigh and back were the only injuries noted. At 6:30 a.m., Bond complained of chest pains, but felt better after he was given an ERG and nitro shot. The clinic records note that Bond was 6'1" and weighed 245 pounds.

Bond was released from jail on bond at approximately 6:30 a.m. on August 11, 1997. It is uncontroverted that he did not sustain any broken bones from the incident at issue and he was never hospitalized because of it.

On August 12, 1997, an article appeared in a newspaper, *The Daily Reporter*, which stated:

> Domestic violence also reared its ugly head, according to [Captain Doug] Chambers.

> Sunday night a 38–year–old Derby resident was arrested for domestic violence battery, disorderly conduct and battery of a law enforcement officer.

> The officers were called to the 200 block of Teal on a disturbance complaint.

1. Bond asserts in his response that at some subsequent point he complained that he was in need of medical care, and requested but was denied medical attention. However, it is apparent from Bond's deposition that this complaint relates to the actions, or inaction, of some other police officer, not any of the individual named defendants. Bond dep. at 23.

Upon arriving, Chambers said, officers found the man battering a woman who also lived at the home.

The injured officer was taken to the hospital, Chambers said, and treated for head injuries. He was released from the emergency room.

The man was booked into county jail, and an Aug. 13 court date was set.

(Def.Exh.13).

It is uncontroverted that, although Bond claims his revenue as a chiropractor has decreased since the incident, he cannot identify any patient who has stopped coming to him because of the incident or the newspaper article. No former patients have told him that they stopped coming to him for that reason.

On August 16, 1997, at approximately 2:22 a.m., Officer Queen investigated an open door at Bond's office at 400 Baltimore Avenue North in Derby. Queen went to the doorway, heard a TV, and yelled out Bond's name. Bond came to the door, and Queen explained why he was there. Queen then left. Bond admits that Queen "may have just been fulfilling his official duty in checking the door."

Bond was charged in municipal court with domestic violence battery, domestic violence disorderly conduct, battery of a law enforcement officer, and obstructing official duty. On February 11, 1998, the municipal court adjudged Bond guilty of battery and disorderly conduct. The other charges were dismissed. Bond was sentenced to 30 days in jail and fined $100.00, but was placed on probation with the condition that he pay restitution in the amount of $695.65 and attend an anger management course.

According to Bond, he pled "no contest" to the charges on the advice of his attorney. Bond admits that he knew by so pleading he would be found guilty. Bond paid the restitution—which was for Sergeant Staats's medical bills and completed

the anger management course which lasted 12 or 13 weeks.

Bond's version of these events is somewhat lengthy, but much of it irrelevant, such as his characterization of Celeste as "particularly volatile" and "most difficult to discipline." (Plf. Fact ¶ 7).[2] He in fact admits that, on the evening in question, "in the heat of the confusion," he threw the purse and hit Celeste, although he denies causing her any injury. (Id., at ¶ 10). He admits that, at the confrontation with the officers, he was upset and, when Staats asked for his name, he responded that he didn't know whether he was going to tell them. (Id. at ¶ 23).

According to Bond, when he refused to give Staats his name, Staats "threw me against the car," and placed him under arrest for resisting arrest. (Bond dep. at 46). Bond then gave his name, but Queen "proceeded to leap at" Bond, knocking the three men to the ground. (Plf. Fact ¶ 27). Bond contends that his back and chest were injured in the scuffle. He contends that, when Lowery and Chancellor took him into custody, they held his hands up behind him injuring his shoulder area.

The videotape recording of Bond's transport (Plf.Exh. 1, at time 1:30:51 to 1:51:37) does show Bond conversing amiably with Queen, with Bond making no complaint of any pain or shock. The medical records from the jail show a bruise on Bond's back and on his thigh. No records indicate any injury to Bond's chest. The jail staff performed an EKG on Bond at 6:30 in the morning when he complained of chest pain. The EKG results were normal; Bond was told he was not suffering a heart attack. Bond did not complain of any shoulder or neck injury to the jail staff during his arrest. A month after the incident, Bond had his shoulder examined by ultrasound. The report of the test noted an echo area which "could" indicate a partial tear in the

---

2. The response also frequently relies on inadmissible evidence. Fact paragraphs 8, 38, 39, 46, 47, and 52, in which Bond relates matters such as how his neighbors viewed the incident, are pure hearsay. The only authority provided for these alleged facts is Bond's own testimony.

supraspinatus tendon, but which ultimately concluded that the test was "[g]rossly unremarkable left shoulder." (Def. Reply Exh. 11, at BON00057). The possible tear has never been confirmed to any reasonable degree of medical certainty. Bond had his wrist X-rayed on October 2, 1997, which showed no evidence of fracture or dislocation.

Apparently as incidents of additional acts of retaliation against him, Bond cites incidents allegedly occurring on August 16, 1997, and again about a week later. In the first incident, discussed previously, Officer Queen observed an open door at plaintiff's office at 2:22 a.m. Investigating, he found Bond present and notified him of the open door. Bond has stated that he was "scared" by Queen's announcement of his presence, but has acknowledged that officers should not ignore open doors to business establishments. In addition, Bond has not identified any particular use of force or other action which would reflect an excessive use of police force.

In the second incident, Bond states that a week after Queen came to investigate the open door, Officer Queen again came around "snooping," and jiggling the door to the office. This affidavit testimony directly contradicts Bond's earlier deposition testimony, where he reported that after the incident of the open door, there was another incident with someone banging on the door to his office. Bond specifically testified that he did not know who did the banging, and did not identify any other incident involving Queen other than the earlier August 16 incident.

### Conclusions of Law

The plaintiff Bond has raised claims for (1) false arrest, (2) defamation, (3) invasion of privacy and unlawful search, (4) excessive force, and (5) denial of free speech. The defendants have presented substantial arguments grounded in the facts for the dismissal of each of these claims. However, while the plaintiff, in his response, devotes a fair amount of time to reciting his version of the facts of the case, his discussion of these issues is extremely brief.

The plaintiff provides no response at all to the defendants' arguments that the claims of defamation, invasion of privacy and unlawful search, and denial of free speech are without merit. The court will grant summary judgment on those claims.

■ In the same vein, the court must find that plaintiff has also essentially abandoned the claim of false arrest. In the defendants' motion, they raise three arguments to support the dismissal of Bond's false arrest claim: (1) that the claim is barred by his municipal court convictions, in which Bond pled no contest to the domestic violence charges and essentially entered into a plea arrangement which conceded probable cause; (2) that probable cause for the arrest for obstructing official duty existed under the facts of the case; and (3) qualified immunity. The plaintiff's response (at 25–26) merely recites the general standards relating to warrantless arrests; it nowhere attempts to respond to defendants' arguments. The court finds that the defendants had probable cause to arrest the plaintiff. The court finds that the arguments advanced by the defendants on the issue of the alleged false arrest are valid and the motion will be granted as to the claim of false arrest.

■ The only issue the plaintiff has at all attempted to seriously support has been the claim of excessive force. In *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court explained that the "reasonableness" of an officer's act of force should be judged "from the perspective of a reasonable officer on the scene, rather than with the $^{20}\!/_{20}$ vision of hindsight."

> Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers ... violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

amount of force that is necessary in a particular situation.

Id., 490 U.S. at 396–97, 109 S.Ct. 1865 (internal citations and quotations omitted). In determining whether an officer's force was reasonable, relevant factors include the severity of the crime, whether the subject posed an immediate threat to the safety of the officer, and whether the subject was resisting arrest. *Wilson v. Meeks,* 52 F.3d 1547, 1553 (10th Cir.1995).

Here, there were essentially two uses of force: (1) the actions of Queen and Staats in attempting to subdue and handcuff Bond, and (2) the actions of Lowrey and Chancellor in taking Bond from the ground and placing him in the police vehicle. As for the first, the court finds there are strong grounds for finding the use of force was not excessive.

■ First, at that time, as discussed above, Queen and Staats had probable cause to believe that Bond had been involved in a domestic disturbance—a violent domestic disturbance—and that he was attempting to leave the scene and interfere with the performance of their official duties. There is no evidence that Queen or Staats directed any blows at Bond with any purpose other than to restrain him from leaving and to complete the handcuffing. Once Bond was handcuffed, the scuffle ceased. There is no evidence that Bond suffered any serious injury arising from the incident. In contrast, one of the officers involved in the scuffle received a concussion, and was unconscious for several minutes.

Moreover, as indicated earlier, the court must conclude that the assertion in the response that Bond was not resisting the arrest is not supported by the cited evidence. Repeatedly, that assertion in the response is made, with the only supporting evidence being a single passage in Bond's deposition. However, that passage merely provides:

Q. Sir, do you admit that on this night that you resisted being arrested by the officers?

A. No.

(Bond dep. at 55, lines 14–16).

This does not support the assertion contained in the response that Bond did not resist the arrest. In this exchange, Bond was simply asked if he would *admit* he resisted the arrest, and Bond refused to make the admission: he declined to agree that he resisted arrest. That is all. Bond makes no affirmative representation that he complied with the officers, and he makes no affirmative representation, under oath, that he did not resist arrest. Queen and Staats have specifically stated that Bond first resisted Staats's efforts to handcuff him, and then fought with both of them as they tried to wrestle him to the ground. To controvert this asserted fact, Bond must present some affirmative evidence that he did not act as the officers have stated. He has not done so.

The second confrontation (with Lowery and Chancellor) is a closer question. That is, unlike the previous incident (in which the evidence simply shows that Bond has refused to concede he was resisting arrest), here there is at least a positive assertion by Bond that would controvert the officers' position. Lowery and Chancellor say that Bond refused to enter the police vehicle. At a subsequent part of his deposition, Bond affirmatively states that he did not refuse to enter the vehicle.

■ Nonetheless, the court believes that the defendants' motion must be granted as to this alleged excessive use of force. Even though Bond asserts that he did not refuse to enter the vehicle, he has not controverted other portions of Chancellor's version of the events: that Bond physically resisted being taken from the ground to the vehicle, and that he shouted obscenities at the officers in the interim. In addition, in considering whether the officers' use of force was excessive, several additional points seem relevant: the interaction between Lowery, Chancellor, and Bond appears to have been brief. Only one actual blow has been specified by Bond: when Chancellor kneed him in the thigh. And it may be noted that Bond has

never suggested he suffered any significant injury from that blow. To the extent Bond has asserted that he suffered injuries from the conflict, they involve not his thigh or leg but his neck, wrists, or shoulders. And, as to those parts of the body, as noted earlier, there has never been any evidence that Bond suffered any identifiable medical injury. Finally, it is important to recognize that, at the time that Lowery and Chancellor were conveying Bond into the police vehicle, Bond was under arrest for domestic violence, resisting arrest, and assaulting a police officer. As the result of Bond's previous acts of resistance, another police officer lay unconscious a few feet away. Even if there is evidence that in one discrete aspect of the matter Bond did not actually resist the officers (getting in the police car), the officers were entitled to take into account Bond's actions in apparently resisting Staats and Queen (in the handcuffing) and their own acts (physically resisting the transport to the vehicle, shouting obscenities at them). Given this background and the markedly limited nature, duration, extent, and effects of the force used by Lowery and Chancellor, the court finds that summary judgment should be granted as to the claim of excessive force against those officers.