**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 12 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ERNEST MEDINA,

        Plaintiff - Appellee,

      v.

MICHAEL CRAM, Police Officer for the City of Colorado Springs, in his individual capacity,

        Defendant - Appellant,

    and

RALPH BRUNING, deceased, Police Officer for the City of Colorado Springs, in his individual capacity; CITY OF COLORADO SPRINGS, a municipality and LOREN KRAMER, Chief of Police for the City of Colorado Springs, in his official capacity,

        Defendants.

No. 00-1153

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D. Ct. No. 98-WY-1264-CB)**

---

Shane Matthew White, Senior Attorney (Patricia K. Kelly, City Attorney, with him on the briefs), City Attorney's Office, Colorado Springs, Colorado, appearing for Appellant.

Dennis W. Hartley (Kimberly K. Caster, with him on the brief), Dennis W. Hartley, P.C.,

Colorado Springs, Colorado, appearing for Appellee.

---

Before **TACHA**, Chief Judge, **SEYMOUR**, and **BRORBY**, Circuit Judges.

---

**TACHA**, Chief Judge.

---

The defendants appeal from the district court's order denying their motion for summary judgment based on the defense of qualified immunity. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and reverse.

## I. Background

The following facts are undisputed. On June 10, 1996, a bail bondsman went to Plaintiff Ernest Medina's residence to take Mr. Medina into custody for a bail bond violation. When Mr. Medina saw the bondsman, he put his right hand behind his back and said he had a gun. The bondsman subsequently retreated and called the police. As numerous officers, including Defendant Officers Cram and Bruning, began arriving at the scene, Mr. Medina refused to leave the house and began using cocaine and drinking rum. In addition to receiving phone calls from the police, Mr. Medina made other phone calls, including one to a friend whom he asked to bring him a syringe so that he could "get high" and a gun so that he could "make a break." In one phone conversation, Officer Bruning tried to convince Mr. Medina to leave the house peacefully, but Mr. Medina said he needed time and told Officer Bruning that he had a gun. During this time, Mr. Medina experienced suicidal thoughts, eventually cutting his left wrist with a knife.

Mr. Medina finally emerged from the house with his left hand in a cup and his right hand wrapped in a towel concealing a staple gun, which Mr. Medina intended as a representation of a weapon. Although officers ordered Mr. Medina to stop, he continued to walk toward and into the street. The officers first used nonlethal beanbag rounds to stop Mr. Medina. When that was unsuccessful, an officer released an attack dog, which bit him and released, returning to the officer. At this time, Officer Cram was following Mr. Medina, planning to stop him by knocking him to the ground. As Officer Cram was communicating his plan to his fellow officers, the attack dog was released the second time. Mr. Medina subsequently dropped to the ground and exposed the staple gun, which officers at the scene believed to be a gun. As he did so, he turned to the left, causing Officer Cram to conclude he and other officers were in the line of fire. From a distance of approximately eight to ten feet, Officer Cram then fired a three-round burst from his automatic weapon, hitting Mr. Medina in the stomach. In addition, Officer Bruning fired two shots at the center of Mr. Medina's body from a distance of approximately ten to twelve feet. Shortly thereafter, Mr. Medina was taken to the hospital where he survived his injuries.

Claiming Officers Cram and Bruning used excessive force in violation of his Fourth Amendment rights, Mr. Medina brought suit in district court pursuant to 42 U.S.C. § 1983. Mr. Medina also brought a § 1983 action against the City of Colorado Springs for maintaining policies that foster excessive use of force and for failing to adequately

train police officers. The district court denied the officer defendants' motions for summary judgment, concluding genuine issues of material fact remain regarding whether the officers' actions were objectively reasonable under the circumstances.

## II. Standard of Review in Qualified Immunity Cases

Although actions for damages provide an important remedy for individuals injured by governmental officials' abuse of authority, such actions sometimes subject officials to costly and harassing litigation and potentially inhibit officials in performing their official duties. Anderson v. Creighton, 483 U.S. 635, 638 (1987); Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982). In order to balance these competing interests, courts recognize the affirmative defense of qualified immunity, which protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). The Supreme Court has emphasized the broad protection qualified immunity affords, giving officials "a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such pretrial matters as discovery.'" Behrens v. Pelletier, 516 U.S. 299, 308 (1996) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). Consequently, courts should resolve the "purely legal question," Siegert v. Gilley, 500 U.S. 226, 232 (1991), raised by a qualified immunity defense "'at the earliest possible stage in litigation.'" Albright v. Rodriguez, 51 F.3d 1531, 1534 (10th Cir. 1995) (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

We review the denial of a summary judgment motion raising qualified immunity

questions de novo. Wilson v. Meeks, 52 F.3d 1547, 1551 (10th Cir. 1995) [hereinafter Wilson I]; Bella v. Chamberlain, 24 F.3d 1251, 1254 (10th Cir. 1994). Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions. Nelson v. McMullen, 207 F.3d 1202, 1205-06 (10th Cir. 2000). After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff. Scull v. New Mexico, 236 F.3d 588, 595 (10th Cir. 2000); Adkins v. Rodriguez, 59 F.3d 1034, 1036 (10th Cir. 1995). Applying the same standards as the district court, we must determine whether the plaintiff has satisfied a "heavy two-part burden." Albright, 51 F.3d at 1534; accord Wilson I, 52 F.3d at 1552. The plaintiff must first establish "that the defendant's actions violated a constitutional or statutory right." Albright, 51 F.3d at 1534; see also Wilson v. Layne, 526 U.S. 603, 609 (1999) (noting the court must first decide whether the plaintiff has alleged deprivation of a constitutional right). If the plaintiff establishes a violation of a constitutional or statutory right, he must then demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct. Albright, 51 F.3d at 1534. In determining whether the right was "clearly established," the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether "the right [was] sufficiently clear that a reasonable officer would understand that what he is doing violates that right." Wilson v. Layne, 526 U.S. at 615 (internal quotation marks omitted).

This two-step analysis "is designed to 'spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Wilson v. Layne, 526 U.S. at 609 (quoting Siegert, 500 U.S. at 232)). If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity. Albright, 51 F.3d at 1535. If the plaintiff successfully establishes the violation of a clearly established right, the burden shifts to the defendant, who must prove "'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" Id. (quoting Hinton v. City of Elwood, 997 F.2d 774, 779 (10th Cir. 1993)). In short, although we will review the evidence in the light most favorable to the nonmoving party, Nelson, 207 F.3d at 1205, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.

This circuit previously required plaintiffs to meet a heightened pleading standard when subjective intent is at issue and the defendant raises a qualified immunity defense. See, e.g., Breidenbach v. Bolish, 126 F.3d 1288 (10th Cir. 1997). We recently held that the heightened pleading requirement does not survive the Supreme Court's opinion in Crawford-El v. Britton, 523 U.S. 574 (1998). Currier v. Doran, 2001 WL 202045 (10th Cir. Mar. 1, 2001). Our decision in Currier is not, however, directly implicated in this case because we review the issues presented here in the context of summary judgment. Furthermore, unlike the dissent, we conclude Crawford-El does not affect our approach to

qualified immunity questions at the summary judgment stage.

Crawford-El should be read narrowly in light of the specific issue before the Court. The Court repeatedly noted that it was addressing standards of proof in the context of the merits of a constitutional claim involving improper motive, rather than in the context of a qualified immunity defense: "The court's clear and convincing evidence requirement applies to the plaintiff's showing of improper intent (a pure issue of fact), not to the *separate* qualified immunity question whether the official's alleged conduct violated clearly established law, which is an 'essentially *legal question*.'" Crawford-El, 523 U.S. at 589 (emphasis added). The Court distinguished Harlow and the qualified immunity context, concluding that, "*unlike Harlow*, the proper balance does not justify a judicial revision of the law to bar claims that depend on proof of an official's motive." Id. at 592 (emphasis added). According to the Court, the dangers presented by a subjective standard in the qualified immunity context (primarily the danger that officials would be subjected to insubstantial claims) are not present in the context of claims involving improper intent. Id. at 593. Hence, to apply Crawford-El's holding to qualified immunity would be to do what the Court explicitly cautioned against: it would conflate two distinct contexts.

The dissent quotes the Court's observation in Crawford-El that a heightened burden for constitutional claims involving improper motive "lacks any common-law pedigree," as well as statutory support. Id. at 594-95. But although the Court emphasized

the lack of support (especially in the federal rules) for the heightened burden in Crawford-El, it also recognized the unique nature of qualified immunity as a creature *separate* from the federal rules: "in Harlow . . . we were engaged in a process of adjudication that we had consistently and repeatedly viewed as appropriate for judicial decision–a process predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." Id. at 594 (internal quotation marks omitted). Hence, the Court's holding only prohibits judicial revision of rules "*separate* from the qualified immunity defense" and does not disturb the case law governing qualified immunity. Id. at 595 (emphasis added).

The dissent therefore reads Crawford-El too broadly and fails to apply Supreme Court precedent emphasizing the unique nature of a qualified immunity defense. See, e.g., Mitchell, 472 U.S. at 526 (characterizing qualified immunity as "an entitlement not to stand trial or face the other burdens of litigation" and as "an *immunity from suit* rather than a mere defense to liability"). The assertion of qualified immunity raises a rebuttable presumption, a proposition recognized by the Court in Crawford-El as one of the three propositions informing Harlow's definition of qualified immunity. Crawford-El, 523 U.S. at 587 ("[W]e presumed that the defense protects all officers in the executive branch of government performing discretionary functions, but held that the presumption was rebuttable." (citations omitted)). A rebuttable presumption necessarily shifts the burden from the party favored by the presumption to the party rebutting it. Hence, our cases

recognizing a plaintiff's "two-part burden" are logical explanations of the practical effect of a qualified immunity defense, rather than a judicial revision of the federal rules. As the Court has said, once qualified immunity is asserted, "plaintiffs may not play dog in the manger." Harlow, 457 U.S. at 808 (internal quotation marks omitted). Consequently, in order for Mr. Medina's claim to survive summary judgment, the record must contain facts that rebut the presumption of the officers' immunity from suit.

### III. Jurisdiction: Immediate Appeal from Denial of Summary Judgment in Qualified Immunity Cases

A district court's denial of a defendant's summary judgment motion based on qualified immunity is an immediately appealable "collateral order" when the issue appealed concerns whether certain facts demonstrate a violation of clearly established law. Mitchell v. Forsyth, 472 U.S. 511, 527-28 (1985) (concluding summary judgment order deciding qualified immunity issues satisfies the test from Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949), because it is "effectively unreviewable," separate from the merits, and "conclusively" settles the issue of a defendant's immunity from suit). The Supreme Court has, however, cautioned that not every denial of summary judgment following the assertion of qualified immunity is immediately appealable. Johnson v. Jones, 515 U.S. 304, 313 (1995). Courts of appeals clearly lack jurisdiction to review summary judgment orders deciding qualified immunity questions solely on the basis of evidence sufficiency—"which facts a party may, or may not, be able to prove at trial." Id.

Consequently, an order will not be immediately appealable unless it "present[s] more abstract issues of law." Id. at 317.

Hence, we have observed that defendants may not immediately appeal a pretrial order deciding "nothing more than whether the evidence could support a finding that particular conduct occurred." Foote v. Spiegel, 118 F.3d 1416, 1422 (10th Cir. 1997). We need not, however, decline review of a pretrial order denying summary judgment solely because the district court says genuine issues of material fact remain; instead, we lack jurisdiction only if our review would require second-guessing the district court's determinations of evidence sufficiency. Behrens v. Pelletier, 516 U.S. 299, 312-13 (1996) ("Denial of summary judgment often includes a determination that there are controverted issues of material fact . . . and Johnson surely does not mean that every such denial of summary judgment is nonappealable."). An order denying summary judgment based on qualified immunity necessarily involves a legal determination that certain alleged actions violate clearly established law. Id. at 313. Defendants may therefore assert "on appeal that all of the conduct which the District court deemed sufficiently supported for purposes of summary judgment" meets the applicable legal standards. Id. Even when the district court concludes issues of material fact exist, we have reviewed the legal question of whether a defendant's conduct, as alleged by the plaintiff, violates clearly established law. Malik v. Arapahoe County Dep't of Soc. Servs., 191 F.3d 1306, 1315 (10th Cir. 1999); Clanton v. Cooper, 129 F.3d 1147, 1153 (10th Cir. 1997); see also

-10-

Wilson v. Meeks, 98 F.3d 1247, 1251-52 (10th Cir. 1996) [hereinafter Wilson II] (noting that–following Johnson and Behrens–other circuits characterize review of whether the plaintiff's version of the facts establishes a constitutional violation as a legal question, which is immediately appealable).

In this case, we need not rely solely on Mr. Medina's version of the facts because the district court found the material facts were not in dispute. Despite this finding, however, the court apparently determined that issues of material fact remain regarding the objective reasonableness of the officers' actions. Whether the officers acted reasonably, however, is a *legal* determination in the absence of disputed material facts. Although the reasonableness standard is inevitably fact dependent, Wilson I, 52 F.3d at 1553, it should not be reserved for the jury in the absence of disputed material facts. Because qualified immunity is a question of law to be resolved at the earliest possible stage of litigation, courts often engage in determinations of reasonableness under the Fourth Amendment, necessarily applying the undisputed material facts to the legal standards.

## IV. Excessive Force Claim

Claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment. Graham v. Connor, 490 U.S. 386, 395 (1989). The reasonableness of an officer's conduct must be assessed "from the perspective of a reasonable officer on the scene," recognizing the fact that the officer may be "forced to make split-second judgments" under stressful and dangerous conditions. Id. at 396-97.

The Fourth Amendment standard requires inquiry into the factual circumstances of every case; relevant factors include the crime's severity, the potential threat posed by the suspect to the officer's and others' safety, and the suspect's attempts to resist or evade arrest. Id. at 396. The reasonableness standard is "clearly established" in the context of § 1983 actions. Wilson I, 52 F.3d at 1552.

We have recognized that the reasonableness inquiry in excessive force cases overlaps with the qualified immunity question, which also requires the application of a reasonableness standard in order to determine whether an officer violated a clearly established right. E.g., id.; Quezada v. County of Bernalillo, 944 F.2d 710, 718 (10th Cir. 1991). In addition, we have suggested this overlap renders a qualified immunity defense of less value when raised in defense of an excessive force claim. E.g., Quezada, 944 F.2d at 718. But regardless of the redundancy in analyses, the overlap does not relieve us of our responsibility to decide the legal questions raised by qualified immunity; it does not transform legal standards applied to undisputed material facts into factual questions necessitating further discovery.

In the absence of disputed material facts, courts often decide questions of reasonableness early in the litigation in order to resolve the "legal question" presented by a qualified immunity defense. Although the Supreme Court has noted the fact-specific nature of a reasonableness inquiry, it has continued to urge the early resolution of reasonableness questions in the context of qualified immunity. See, e.g., Anderson v.

-12-

Creighton, 483 U.S. 635, 641 (1987) (noting the "objective (albeit *fact-specific*) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful" and resolving the question as a *matter of law* (emphasis added)). In fact, the Court has rejected an approach to qualified immunity that would treat Fourth Amendment claims differently from other constitutional claims. See id. at 643-44. Because the material facts in this case are undisputed, we must follow the Court's approach to qualified immunity and decide whether the defendants' actions were reasonable as a matter of law.

Mr. Medina specifically claims that the officers acted unreasonably in *creating* the need to use force. In addition to considering whether the officers reasonably believed they were in danger at the time they used force, we have considered "'whether [the officers'] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'" Allen v. Muskogee, 119 F.3d 837, 840 (10th Cir. 1997) (quoting Sevier v. City of Lawrence, 60 F.3d 695, 699 (10th Cir. 1995)). An officer's conduct before the suspect threatens force is therefore relevant provided it is "immediately connected" to the seizure and the threat of force. Id.; Romero v. Bd. of County Comm'rs, 60 F.3d 702, 705 n.5 (10th Cir. 1995); see also Bella, 24 F.3d at 1256 ("Obviously, events immediately connected with the actual seizure are taken into account in determining whether the seizure is reasonable."). This approach is simply a specific application of the "totality of the circumstances" approach inherent in the Fourth Amendment's

reasonableness standard. See Tennessee v. Garner, 471 U.S. 1, 8-9 (1985) (recognizing courts should ask "whether the totality of the circumstances justified a particular sort of search or seizure"). We emphasize, however, that, in order to constitute excessive force, the conduct arguably creating the need for force must be immediately connected with the seizure and must rise to the level of recklessness, rather than negligence. The primary focus of our inquiry, therefore, remains on whether the officer was in danger at the exact moment of the threat of force. Bella, 24 F.3d at 1256 & n. 7 (refusing to scrutinize events occurring one hour before the actual seizure and noting the events were not immediately connected with the seizure); see also Wilson I, 52 F.3d at 1554 (citing cases from other circuits confining inquiry to moment of threat).

According to Mr. Medina, the officers' actions after he left the house and began walking toward the street constituted reckless and deliberate conduct giving rise to the threat of force. Specifically, he argues the officers should have remained under cover rather than following him in an attempt to knock him to the ground. He apparently argues that their failure to take cover was particularly reckless in light of the attack dog's release, which increased the risk of force. We have, however, suggested that an officer's failure to take cover is "at issue only insofar as it [bears] upon whether the officer's life [is] truly in danger." Wilson I, 52 F.3d at 1554. Moreover, even if we were to consider whether an officer's failure to take cover contributed to the need for force, Mr. Medina has clearly failed to establish that the officers' actions in this case rise to the level of reckless or

-14-

deliberate conduct. See Romero, 60 F.3d at 704-05 (rejecting plaintiff's argument that officer acted unreasonably in using deadly force in self-defense after not handcuffing suspect); see also Sevier, 60 F.3d at 699 n.7 ("Mere negligent action precipitating a confrontation would not, of course, be actionable under § 1983."). In this case, Mr. Medina communicated he had a gun, emerged from the house covering what could reasonably be interpreted as a weapon, and began walking away from the house into the street. The officers' response in attempting to stop Mr. Medina was reasonable under the circumstances. Mr. Medina has, therefore, failed to establish that the defendants violated his Fourth Amendment rights.

Moreover, contrary to the district court's opinion, our decision Allen v. Muskogee, 119 F.3d 837 (10th Cir. 1997), does not support the district court's conclusion that genuine issues of material fact remain. In Allen, although we recognized that the officers' conduct prior to the use of force could be included in the reasonableness inquiry, we identified a specific dispute of material fact regarding eyewitness testimony. Id. at 841. Indeed, even the defendants admitted the eyewitness depositions contained differences concerning the officers' approach of the suspect immediately prior to the threat of force. Id. In addition, Allen contains no indication that the defendants raised a qualified immunity defense; the defendants' summary judgment motion was, therefore, judged under the typical summary judgment standard, which requires a lesser showing by the plaintiff.

## V. Expert Affidavit

In response to the defendants' assertion of a qualified immunity defense, Mr. Medina submitted an affidavit of an expert, which he argues supports his contention that genuine issues of material fact exist in this case. The expert's affidavit does not, however, highlight a disputed issue of fact; rather, it simply contains the ultimate conclusion that the officers' use of force did not conform with accepted police guidelines and practices and was, therefore, excessive. We have, of course, recognized that claims based on violations of state law and police procedure are not actionable under § 1983. Romero, 60 F.3d at 705 (state law and police procedure); Wilson I, 52 F.3d at 1554 (police department regulation); see also Davis v. Scherer, 468 U.S. 183, 194-96 (1984) (rejecting the argument that § 1983 liability may be based solely on a violation of a state statute or regulation). Moreover, the reasonableness standard does not require that officers use "alternative 'less intrusive' means." Illinois v. Lafayette, 462 U.S. 640, 647-48 (1983). If we were to follow the dissent's approach and consider the expert's assertions regarding the failure to use pepper spray and other tactical measures, we would be evaluating the officers' conduct from the 20/20 perspective of hindsight rather than from the perspective of an officer making split-second judgments on the scene.

Furthermore, the expert based his opinion generally on his knowledge of various documents, rather than presenting specific facts, and did not indicate whether his conclusion rests on a finding that the officers acted recklessly, as opposed to negligently.

-16-

We therefore follow the well-settled principle that an expert opinion may not be sufficient to overcome summary judgment if "it is conclusory and thus fails to raise a genuine issue of material fact." Matthiesen v. Banc One Mortgage Corp., 173 F.3d 1242, 1247 (10th Cir. 1999); accord Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 92 (1st Cir. 1993); Evers v. General Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985); Merit Motors, Inc. v. Chrysler Corp., 569 F.2d 666, 673 (D.C. Cir. 1977). The general conclusions of Mr. Medina's expert clearly fail to raise a genuine issue of material fact.

Because Mr. Medina has failed to satisfy his burden in overcoming the officers' assertion of qualified immunity, we REVERSE the district court's order finding genuine issues of material fact and REMAND with instructions to enter judgment in favor of the officer defendants.

**No. 00-1153, Ernest Medina v. Michael Cram, et al.**

**SEYMOUR, Circuit Judge, dissenting**

I regret that I am unable to concur in either the legal or the factual analysis set out in the majority opinion. First, the majority applies a legal framework that in my view does not survive the Supreme Court's recent decision in *Crawford-El v. Britton*, 523 U.S. 574 (1998), in which the Court addressed the proper balance of the competing interests at stake when a defendant in a civil rights case raises the affirmative defense of qualified immunity. In *Crawford-El*, the Court expressly ruled that "courts of appeals may [not] craft special procedural rules for such cases to protect public servants from the burdens of trial and discovery that may impair the performance of their official duties." *Id.* at 577. Because the pre-*Crawford-El* authority relied on by the majority undeniably does exactly that, it is no longer valid. Second, I am troubled by the majority's treatment of the issue of reasonableness in an excessive force case as a purely legal issue amenable to resolution on summary judgment. Contrary to authority in this and other circuits, the majority believes the issue of reasonableness in the qualified immunity context should be treated differently than the law treats it otherwise. Finally, I cannot agree with the majority's conclusion that the use of force in this case was reasonable as a matter of law. Accordingly, I respectfully dissent.

# I

## Legal Framework

While the majority does acknowledge that damage actions are an important remedy for those injured by the abuse of governmental authority, the majority's analysis nonetheless values only the interest of the defendant in avoiding pretrial discovery. In *Crawford-El*, however, the Court pointed out that its opinion in *Harlow* should not be read to eliminate the need to balance the interests of both the plaintiff and the defendant, emphasizing that "[i]n situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees," and that "social costs" to the interest of a defendant public official in avoiding discovery therefore "do not necessarily justify serious limitations upon 'the only realistic' remedy for the violation of constitutional rights." *Id.* at 591 (citations omitted). The tenor of the majority's discussion does not, in my judgment, reflect the balanced view required by the Court's analysis. Significantly, the Court noted:

> Discovery involving public officials is indeed one of the evils that *Harlow* aimed to address, but neither that opinion nor subsequent decisions create an immunity from *all* discovery. *Harlow* sought to protect officials from the costs of "broad-reaching'"discovery, and we have since recognized that limited discovery may sometimes be necessary before the district court can resolve a motion for summary judgment based on qualified immunity.

-2-

*Id.* at 593 n.14 (citations omitted). To the extent the majority bases its elevation of the defendant's interests over those of the plaintiff on the need to eliminate all discovery, it cannot be reconciled with the Court's recognition that both interests are entitled to equal consideration in the balancing process.

The majority's undue emphasis on the interest of the defendant distorts its discussion addressing appellate review of the denial of a summary judgment in the qualified immunity context. Because the majority's approach runs contrary to the discussion in *Crawford-El* addressing the need to balance both interests, the majority justifies its reliance on circuit law predating *Crawford-El* by concluding that case is not implicated here. This assertion is flawed in two respects.

First, while the Court in *Crawford-El* struck down heightened pleading requirements in the context of civil rights cases alleging constitutional violations involving intent, nothing in its rationale for doing so is peculiar to that category of cases. To the contrary, the Court's reasoning and ruling are framed in broad terms and by those terms are applicable to any requirement in a civil rights case that is outside the Federal Rules of Civil Procedure and that benefits a defendant at the expense of a plaintiff.

Second, I cannot agree with the assertion that *Crawford-El* is not implicated because we are dealing with the plaintiff's burden in responding to the assertion of qualified immunity rather than the plaintiff's burden to plead a

constitutional claim initially. The defendant's interests in avoiding the burdens of discovery and trial which the Supreme Court held were implicated in the pleading requirement at issue in *Crawford-El* are the very interests which justified the judicial creation of the doctrine of qualified immunity. In striking down the heightened pleading requirement at issue there, the Court pointed out, as I have noted, that *Harlow* itself does not provide precedent for the notion that the need to prevent discovery justifies placing "a thumb on the defendant's side of the scales," *id.* at 593 or changing "the burden of proof for an entire category of claims," *id.* at 594. The Court also pointed out that "[n]either the text of § 1983 or any other federal statute, nor the Federal Rules of Civil Procedure, provide any support for imposing the clear and convincing burden of proof on plaintiffs either at the summary judgment stage or in the trial itself." *Id.* Finally, the Court stated that "[t]he unprecedented change made by the Court of Appeals in this case . . . lacks any common-law pedigree and alters the cause of action itself in a way that undermines the very purpose of § 1983–to provide a remedy for the violation of constitutional rights." *Id.* at 594-95.

As the Supreme Court's discussion reveals, our pre-*Crawford-El* cases increasing the plaintiff's evidentiary showing for summary judgment purposes once the defendant raises a qualified immunity defense are as lacking in precedential grounding or statutory authority as was the heightened pleading

requirement in *Crawford-El*. As was true with the requirement addressed by the Court there, to the extent the "heavy two-part burden" upon which the majority bases its analysis is greater than the ordinary burden upon a non-movant in a summary judgment case, it is not justified by *Harlow*, any federal statute, the rules of civil procedure, or the common law. Moreover, it undermines the remedial purpose of section 1983. As the Court held analogously in *Crawford-El*, there is simply no authority for treating summary judgment in the qualified immunity context any differently than we treat it in any other case.

The Court did state that once a defendant makes a properly supported motion for summary judgment on qualified immunity grounds, the plaintiff must identify affirmative evidence from which a jury could find that the plaintiff has carried his burden of proof. *See id.* at 600. However, this is the same burden that is imposed upon a plaintiff in any civil case in response to a defendant's motion for summary judgment, and therefore does not support the notion that a plaintiff bears a heightened burden when the summary judgment motion invokes qualified immunity.

## II

## Reasonableness As a Matter of Law

"Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action." *Anderson v. Creighton*, 48 U.S. 635, 639 (1987) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)). "We analyze a § 1983 claim of excessive force by determining whether the officers' actions were objectively reasonable in light of the surrounding facts and circumstances." *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Because of the similarity of standards, this court has recognized that in an excessive force case, the qualified immunity analysis is intertwined with the merits of the case, *see infra* at 7-8. The majority posits that because the material facts here are purportedly undisputed, a court may determine the objective reasonableness of the challenged conduct as a matter of law in order to promote the defendant's interest in avoiding prolonged pretrial proceedings. In view of *Crawford-El*, however, the defendant's interest cannot support the weight the majority places upon it. Moreover, I am deeply troubled by an analysis which removes an entire category of civil rights cases from the jury, and I question "to what extent questions of 'reasonableness' can be resolved on summary judgment." *Abraham v. Raso*, 183 F.3d 279, 289 (3d Cir.

-6-

1999).  In my judgment, the majority's position is contrary to excessive force cases in this and other circuits.

The majority characterizes the objective reasonableness inquiry as a legal issue notwithstanding Tenth Circuit jurisprudence recognizing the matter as primarily a fact issue to be decided by the jury.  In *Quezada v. County of Bernalillo*, 944 F.2d 710, 715 (10th Cir. 1991), we held that "whether the police used excessive force in a § 1983 case has always been seen as a factual inquiry best answered by the fact finder." [1]  We followed that admonition in *Sevier v. City of Lawrence*, 60 F.3d 695, 699-701 (10th Cir. 1995) (holding, under *Johnson v. Jones*, 515 U.S. 304 (1995), jurisdiction lacking over interlocutory appeal of qualified immunity issue in excessive force case, and noting "conflicting evidence as to whether the officers precipitated the use of deadly force by their own actions during the course of the encounter immediately prior to the shooting [of suicidal person]." *Id.* at 701).  *See also Allen v. Muskogee*, 119 F.3d at 840 (same); *Mick v. Brewer*, 76 F.3d 1127, 1135-37 (10th Cir. 1996) (holding law governing excessive force clearly established in 1992 and reversing grant of summary judgment on qualified immunity issue).  While *Quezada* and *Allen* are summary judgment cases on the constitutional issue of excessive force rather than on the

---

[1] We also held that excessive force cases, unlike First Amendment issues, do not fall into a class of cases where "a heightened standard of review is necessary." *Quezada*, 944 F.2d at 716.

-7-

availability of qualified immunity, our cases have also made clear that, because

both inquiries turn on objective reasonableness, *the merits of an excessive force*

*claim are intertwined with the qualified immunity issue* and the queries therefore

cannot be separated into two discussions.

> [I]n excessive force claims asserted under the Fourth Amendment,
> the qualified immunity question is usually answered in the Fourth
> Amendment inquiry. This is because, in the excessive force context,
> the Fourth Amendment inquiry asks directly whether the police
> officer reasonably could have believed that the force was necessary
> under the circumstances.

*Dixon v. Richer*, 922 F.2d 1456, 1463 (10th Cir. 1991) (footnotes omitted).

Under our case law, therefore, the issue of the objective reasonableness of an

officer for summary judgment purposes is the same whether or not the defendant

has raised the affirmative defense of qualified immunity. Accordingly, *Quezada*

and *Allen* govern our analysis here.

Courts in other circuits have also expressed concern over "to what extent

questions of 'reasonableness' can be resolved on summary judgment." *Abraham*,

183 F.3d at 289.

> Reasonableness under the Fourth Amendment resembles tort law in
> its attention to how a specific, concrete circumstance should affect an
> officer's judgment. This sensitivity to context suggests that
> regardless of whether objective reasonableness invokes a different
> and heightened standard from negligence, reasonableness under the
> Fourth Amendment should frequently remain a question for the jury.
> To put the matter more directly, since we lack a clearly defined rule
> for declaring when conduct is reasonable in a specific context, we
> rely on the consensus required by a jury decision to help ensure that

-8-

the ultimate legal judgment of "reasonableness" is itself reasonable and widely shared.

*Id.* at 289-90; *see also Katz v. United States*, 194 F.3d 962, 970 n.5 (9th Cir. 1999) (in addressing qualified immunity defense, "[t]he question of the reasonableness of force is usually a question of fact for the jury"), *cert. granted sub nom. Saucier v. Katz*, 121 S. Ct. 480 (2000). [2]

Likewise in *McNair v. Coffey*, 234 F.3d 352 (7th Cir. 2000), *petition for cert. filed*, 69 U.S.L.W. 3631 (U.S. Mar. 8, 2001) (No. 00-1456), Judge Easterbrook, writing for the court, rejected the position the majority adopts and refused to hold in favor of a defendant in a close case, stating that

> "[t]o say that a public official is not exposed to damages even when all legal issues were authoritatively resolved before the conduct occurred would be to make a substantial change in the scope of liability under 42 U.S.C. § 1983. [The defendant's] argument for immunity in factually (as opposed to legally) close cases is fundamentally a request to increase the plaintiff's burden of proof–to insist that the plaintiff show a violation not by a preponderance of the evidence (where the plaintiff can win a close case) but by clear and convincing evidence (where all close cases go to the defendant), perhaps even proof beyond a reasonable doubt. Only then, the

---

[2] I recognize, of course, that "on summary judgment, the court may make a determination as to reasonableness when, viewing the evidence in the light most favorable to [the plaintiff], the evidence compels the conclusion that [the officer's] use of force was reasonable." *Katz v. United States*, 194 F.3d 962, 970 n.5 (9th Cir. 1999), *cert. granted sub nom. Saucier v. Katz*, 121 S. Ct. 480 (2000). While summary judgment may be available in excessive force cases, those cases are rare and the evidence, when viewed most favorably to the plaintiff, must be compellingly in favor of the defendant. As I discuss below, I am not persuaded the evidence presents those circumstances here.

argument goes, can we be *sure* that the public official should have recognized the culpability of his conduct. Yet a § 1983 case is not a criminal prosecution, and the preponderance standard applies to civil claims of all sorts. *It should not be changed covertly, through an immunity defense that imposes a heightened standard of proof*.

*Id.* at 355 (citations omitted) (emphasis added). Significantly, the court in

*McNair* also stated:

> Let us never forget that immunity in § 1983 cases is a judicial invention. Congress provided for liability in absolute terms. Public officials who violate the Constitution or laws must pay; immunity is anti-textual. The justification for immunity is that the scope of liability has grown like topsy since 1871, when § 1983 was enacted, and that to carry out what Congress must have meant a court may depart from what Congress said. That's a treacherous path for any judge to take, though history may provide a map. . . [However,] a general doctrine of official immunity, independent of legal uncertainty, is not only anti-textual but also anti-historical in fourth amendment cases.

*Id.* at 356.


### III

### Summary Judgment on this Record

Finally, I cannot join the result reached by the majority. It is undisputed that the law governing excessive force cases was clearly established at the time of the incident here. The majority holds that defendant police officers acted objectively reasonably as a matter of law when they commanded that plaintiff leave his house knowing he was suicidal and had been drinking. Importantly,

-10-

plaintiff made clear on the telephone to Officer Bruning that he wanted to commit suicide, Aplt. App. at 151, and that he wanted the officers to shoot him, *id.* at 153.[3] In fact, the record reflects not only that plaintiff came to the door of his house saying "Shoot me, shoot me," *id.*, but that he also was saying "shoot me" as he walked out among the officers, *id.* at 112, 169, 179. He was very drunk, "staggering" and "weaving." *Id.* at 114. Notwithstanding plaintiff's agitated and suicidal state, the officers' knowledge that he wanted the police to shoot him, and their belief that he was holding a gun, one officer, instead of taking cover, attempted to sneak up behind plaintiff to knock him to the ground. The majority also holds reasonable as a matter of law the actions of another officer who released an attack dog on plaintiff while the first officer was attempting to sneak up on him. These facts, viewed most favorably to Mr. Medina, do not compel the conclusion that the actions of either officer, which in combination brought about the situation where deadly force was arguably necessary, were objectively reasonable as a matter of law.[4]

---

[3] In his statement, Officer Bruning said it "entered his mind that Mr. Medina might try to use the police to shoot him." Aplt. App. at 152.

[4] In view of the undisputed facts here demonstrating that the events creating the alleged need to use deadly force were intimately and immediately connected to the use of that force, I see no need for the citations and gloss to *Bella v. Chamberlain*, 24 F.3d 1251, 1256 & n.7 (10th Cir. 1994), and *Wilson v. Meeks*, 52 F.3d 1547, 1554 (10th Cir. 1995). The statement by the majority appended to those cases that the primary focus of the inquiry should be on the exact moment at

(continued...)

-11-

To support the existence of fact issues related to the conduct of the officers, plaintiff offered the affidavit of an exceptionally well-qualified police expert to counter the assertion that the conduct here was objectively reasonable. Because in my judgment that affidavit clearly raises fact questions going to whether it was reasonable for the officers to conduct themselves as they did, I quote substantial portions from it:

1.    I am *a police practices and tactics expert which includes* crowd control, *use of force*, *cleoresin capsicum (pepper spray)*, batons, *arrest techniques*, and policies and procedures. . . .

2.    I am a former sworn police officer, deputy sheriff, and Staff Executive. As the Staff Executive for a medium-sized Massachusetts police department, I headed the Administrative Bureau in addition to directing Planning and Research. My responsibilities included the writing and implementing of policies and procedures, *review of use-of-force complaints*, discipline recommendations, plus other administrative duties.

3.    Educationally, I was awarded an Associate Degree in Police Science and a Certificate in Corrections from the Northern Virginia Community College; a Bachelor of Science Degree from the University of Baltimore; a Master of Science Degree in Public Relations from Boston University; a Master Degree in Business Administration from Babson College; a Ph.D. in Applied Management and Decision Sciences from Walden University, in addition to post-graduate study.

---

[4](...continued)
which the force was used cannot be reconciled with the Supreme Court's directive to examine the totality of the circumstances, and in addition raises the unnecessary metaphysical problems discussed in *Abraham v. Raso*, 183 F.3d 279, 291-92 (3d Cir. 1999).

4.    Vocationally, I am the Vice Chairman of the Defensive Tactics Institute, Inc. (DTI) which is a private criminal justice training firm. Established in 1979, *I have taught criminal justice professionals across the United States, Canada, and England*. Instructional *topics included officer safety*, . . . *use of force* policies and procedures, . . . *arrest techniques*, . . . *chemical aerosol sprays*, defensive tactics, *plus other less-than-lethal disciplines*.

5.    Additionally, I have *authored more than 115 articles, newsletters, and/or handbooks*, . . . .

7.    According to the Officer-Involved Shooting summary, it is my understanding that Officers Cram and Ellis were within 8 to 10 feet of Mr. Medina at the time of the shooting (Officer Involved Shooting, Thompson summary, p. 2). Officers Comte and Cirka were entering the street toward the subject (Ibid.). *Unless there are exigent circumstances which demand that officers take unnecessary risks, officers are taught to remain behind cover and concealment.* Cover is anything that will hide the officer and also stop bullets. Concealment is anything that will hide the officer, but will not stop bullets. *In my professional opinion, there were no exigent circumstances in this incident, therefore, these officers should have remained behind cover and concealment and not have engaged Mr. Medina, until he had surrendered.* This action is *consistent with contemporary police training and identified literature on this subject*.

8.    *In my professional opinion, the officers created a dangerous situation for themselves, and then used deadly force to extricate themselves from it.* Because Officers Cram and Ellis were so close to Mr. Medina when the dog attacked him, it is reasonable for his arms and hands to flail in an effort to protect himself from the dog. A reasonable and well-trained officer would have expected this type of reaction from a person who is being attacked by a dog. Had the officers stayed behind cover, there would not have been the need to shoot Mr. Medina. The *officer safety literature surfaces and*

-13-

*officers are taught that they should remain behind cover and concealment where they are safer than to leave these areas creating a dangerous situation for themselves and others*.

9. *In my professional opinion, the officers failed to follow generally-accepted guidelines for the escalation of force*. For example, the *use of pepper spray was not attempted by* the officers, and *this option on the force continuum should have been used prior to shooting Mr. Medina*. Effective pepper spray may have blinded Mr. Medina so that he could have been forced into submission without the use of deadly force.

10. The actions of *Officers Cram and Bruning demonstrate the failure to follow generally-accepted and taught officer safety and use-of-force guidelines thus causing them to use force*, which in my professional opinion, was excessive.

Aplt. App. at 138-142 (emphasis added). This expert opinion was rendered after reviewing all the materials proffered by defendants in support of the motions for summary judgment. The expert concluded: "It is my understanding that the *depositions* of the defendant officers are *scheduled for mid-summer*. *In order to complete my opinions in this matter, I will need to read their depositions.*" *Id.* at 142 (emphasis added). [5]

_____

[5] I am particularly troubled by the fact that the majority's decision preempts consideration of the depositions of defendant police officers. In his response to defendants' motions for summary judgment, plaintiff requested the district court to permit the depositions of the police officers to go forward if the court were inclined to grant the motion for summary judgment. Aplt. App. at 134-35. Because the district court held that summary judgment was not proper on the state of the record presented, further development of evidence in opposition to the motion for summary judgment was not necessary. The record reflects that the depositions of Officers Bruning and Cram had not yet been "cleared on all

(continued...)

-14-

Rather than being conclusory, this affidavit constitutes probative evidence suggesting that contemporary police procedures were violated by defendant officers in this case, and that, at a minimum, the completion of scheduled discovery was necessary to resolve fact issues regarding whether the officers needlessly created exigent circumstances and should have been using other means to subdue this intoxicated and suicidal man. *See*, *e.g.*, *Allen*, 119 F.3d at 842 ("Plaintiff relied principally on her expert witness, . . . a former police officer and college professor and now a consultant on police and security matters"). *See generally* Fed. R. Evid. 704, 705; W RIGHT & GOLD, FEDERAL PRACTICE & PROCEDURE §§ 6284, 6294. As in *Allen*, the record in our case does not show that defendants challenged the qualifications of plaintiff's expert on police procedures and tactics.

In sum, I cannot agree with the assertion that the Supreme Court's analysis in *Crawford-El* is not implicated in this case. In my view, our prior case law requiring a plaintiff to shoulder a "heavy two-part" burden once qualified immunity has been raised has been overruled by *Crawford-El* to the extent this

---

[5](...continued)
calendars," *id*. at 135, and that the depositions of Chief Kramer and Officers Comte and Ellis were set for the next month. In my view, granting summary judgment for defendants on appeal is premature because it is based on the statements of officers made during the police department investigation which had not been subject to cross examination.

burden exceeds that borne by any plaintiff responding to a summary judgment motion in a civil case. I cannot agree that a court can or should rule as a matter of law on every excessive force case. In my view we may only do so when reasonable minds could not differ on whether the use of force was objectively reasonable. I cannot agree that the circumstances here present an appropriate case for resolving the issue as a matter of law. I therefore dissent.